The first case on the calendar today is 2012-16-10, YN RE DORON ADLER. Mr. Yonai, is that pronounced? Yonai. Yonai. Thank you, May. Please, the court. Based on the briefing, there actually doesn't seem to be a whole lot of disagreement about what the claim means and what Hirata teaches. And there's a passage from page 12 of the Patent Office's brief that I think is interesting to take as a starting point. And that's in the middle of page 12 of the brief. The Patent Office writes, The Board rejected Adler's argument that Hirata did not teach comparison to two reference values of tissue, one reference value for healthy tissue and one for blood. The Board explained, using Hirata's teaching on color tone image analysis, that this measure considered two reference values. Hirata discloses comparing the color tone of a known variceal region with the color tone of a known healthy esophageal region. And this goes to the heart of two issues that we briefed that I'd like to talk about today. One is the no substantial evidence. It's point four in our brief. And the new ground of rejection. It's point one in our brief. Perhaps a few minutes talking about Hirata would be in order because it's really not the most accessible of references if it would be instructive to the court. Well, I mean, maybe you can just short circuit it by talking about Hirata in terms of what the Board concluded. I mean, where is the error in what – I mean, you pointed up to the paragraph on page 12. What is the significance of that with respect to the comparison of Hirata? Well, what Hirata does is – the clinical teaching of Hirata is to take a video endoscope and to look at the esophageal varics, the esophageal varices. And there are two quantitative indicators that he talks about. The one that the Board talks about here – excuse me – that the patent office in the brief talks about and that the Board relied upon is the color tone analysis. And that is – the point of a video endoscope is you can take an image and analyze it by computer as opposed to the previous endoscopes where you could just have a look and subjectively determine. So we have a quantitative method here based on a computer that Hirata teaches us. And he says you take a picture of the esophageal varics and you identify the area of the varics and the red value – right, it's RGB. So you take the intensity of the red value in the varics area and you compare that to the red value from the esophageal area. So that's one comparison. You compare the color tone of the red in the varics to the color tone of the red in the esophageal. And that's it. That's your one comparison. And your argument is what? That it's not close enough to claim – what is it – claim 57? Claim 57. Because claim 57 has an entirely different kind of comparison or a somewhat different type of comparison or what? An entirely different type of comparison. In fact, there are two comparisons. The reason there are two comparisons is because it's for a completely different purpose. With the – claim 57 is a swallowable capsule. And you swallow this capsule and it traverses the entire GI tract and it looks for problem areas. It looks for pathologies. And in order to identify – Claim 57 looks for the presence of blood and Hirata does not. Hirata does not because the way Hirata works is you go in with a video endoscope and you know that the patient suffers from portal hypertension. You know there's a varics. You manually go to the location of the varics and you take a picture and you analyze it. Whereas with the swallowable capsule, you're looking for pathologies. Hirata doesn't talk about looking for pathologies. He talks about how to determine how bad the pathology is. So – I guess I'm not sure there's a distinction. Firstly, let me clear up. I mean when you say looking for color versus looking for blood, I mean there's a correlation, right? Red means blood. There is a correlation there. Right, right. So there's no major distinction between the two. So tell me again why – I mean we're dealing with obviousness. We're not dealing with anticipation here. So why isn't it close enough? Okay, so Claim 57 talks about taking a test value, right, because the capsule is traversing the GI tract and it takes a picture. And that's the test value. And it compares the test value to two reference values. One of them is for healthy tissue. One of them is for blood. And, you know, depending on how many parameters, if it's three parameters, then you do some kind of Euclidean distance. We don't have to get into the details of that. But whichever of those two reference values the test value is closer to will determine whether that particular image detected a pathology or if it's healthy tissue. So you have a test image and you have two reference values. And you perform two comparisons. And that's to detect whether there is a problem, whether there is healthy tissue or the presence of blood. Unlike Hirata, where he goes in, he knows there's a pathology there, and he just detects whether it's likely to bleed or not likely to rupture. So, I mean, the point really is looking at the claim language. And whatever you call these values, reference value, test value, there's a bit of confusion. But the point is the Hirata reference talks about one comparison of two values. Our claim talks about two comparisons among three values. And if the board was determining that it would have been obvious based on Hirata to do these two comparisons, it didn't find that. That wasn't the holding of the board. Well, the board says, and this is at A38, they said it would have been, or I'm paraphrasing. It would have been obvious to a person skilled in the art to compare a test sample to each of these two types of reference values. Right? Well, let's look at that. You're reading from A38, page 8 of the decision. And the reasoning here is Hirata discloses comparing color tone of a known variceal region with color tone of a known healthy esophageal region. So I have one comparison between these two values in a single image. And the board then, if we were to take the next sentence at face value, the board then jumps to it would have been obvious to use the processor, Hirata's processor, to compare color tone, and then it just mimics the claim language. Compare the color tone of an image with a reference value for healthy tissue and a reference value for blood in order to detect the presence of blood, as suggested by Miron. There's just not enough reasoning there for us to understand what that obviousness rejection is about. You go from the Hirata reference, which talks about one comparison, and there's a leap to concluding that the claim would have been obvious based on these two comparisons. And that leap is entirely not supported by the evidence. I'm afraid I'm not addressing the court's concern. Is there something in the record I can try to clarify? Well, no. I mean, so does it come down to a difference? Then is it a substantial evidence inquiry as to whether or not – I mean, obviousness has always involved some sort of a leap, right? Absolutely. So I guess I'm looking for you to explain to us why there's such a major distinction between the two, i.e., the Claim 57 and Hirata, that the leap wasn't – I mean, I know the burden's not on you, but here we are. I mean, otherwise, necessarily. Right. So if we're talking about anticipation, all we need to do is find it in the reference for whatever purpose. Right, right. But we're not – We're in obviousness here where we need to look at the logic, the technical logic behind the references. And so the examiner here, or the board, is combining the Meron reference, which is a prior application of the same applicant of the present invention, given imaging, which makes swallowable capsules. So the Meron reference was a swallowable capsule, and it just referred in a single line to a sensor for detecting the presence of blood. Isn't that enough to give notice to a poseda on the combination of the Meron and Hirata arts? Meron doesn't even say that the sensor for detecting blood would be a visual sensor. Yeah, it doesn't elaborate even on how to go about the sensing, but it does mention it. It says means, right, a means for detecting the presence. It may. There's no structure there. Well, what we're not – we're not arguing here that it wouldn't have been obvious to use a visual mechanism for – within Meron. What we're saying is that the image analysis method that's recited in the claim, right, the only image analysis in the prior art that the examiner relied on was Hirata. There's no image analysis in Meron. The entire image analysis – That's a means for detecting the presence of blood, right? In Hirata? Yeah. No, no. No, we don't think it is. What Hirata does is it's a – the clinical implications of Hirata are for – Doing an effective color scale analysis that looks for red stuff. You could say it looks for red stuff, but it does that for the purpose of predicting a rupture, predicting whether a patient is likely to bleed or not likely to bleed. And Judge Gross asked you if that red stuff wasn't blood, right? Red stuff detected in the image? Yeah. I don't think that would be – I don't know if that's blood per se. That's the very – I think that's – but you said it was. I think that's how you answered her. I'm not sure I did say that. If I did, that's – I thought there was a general question about whether there's a correlation between red and blood. I guess we could say that. That's not something that I – I can't deny that. Well, you're not relying on just the purpose, right? I mean, the different purpose won't get you there. I mean, it's what it claims, right? I mean, if Hirata was doing it for one purpose and you're doing it for another, that's not enough to get around the obviousness analysis, right? Well, there's something about that because there's combining Hirata with Meron, right? Meron is out to detect the presence of blood. Hirata does not detect the presence of blood. He detects the likelihood of future bleeding. So are you arguing that – I mean, are you arguing the combination? One of the arguments that are – I'm sorry for interrupting. I asked you a question. Point five in our brief is about the motivation to combine. It's not one of the points I meant to discuss today, but, yes, that's one of our arguments about the motivation to combine not being lacking, firstly, and, secondly, being different between what the examiner – the way the examiner combined the references and the way the board combined the references. So the pattern – let me make sure I understand this correctly. The pattern, it's a method for one of the things. It detects the presence of blood. Yes. And it does that in real time. Yes. Whereas the prior art, Hirata especially, would detect a potential, like a potential for a rupture, or it could forecast bleeding, but it doesn't do it in real time, and it doesn't tell you when the bleeding would occur. That's correct. That is correct. That is one difference, and that's why we argued in point five of the brief. It would not have been obvious to take these two references and use them together. Well, why don't you – why don't we hear from the government and have a good time. Thank you. May it please the Court. Applicant Adler here sees claims directed to a method of using a swallowable capsule to take images of the gastrointestinal tract and compare them. Well, if you don't mind, why don't you start – begin with Judge Rayna's last question, not to your friend on the other side. Do you recall that? I'm just – I mean, talking about the comparisons and what the differences are between the comparisons made in Hirata and the comparisons made in Clinton's system. All right. So in Hirata, there were at least two different comparisons going on, and he was looking for ways to figure out how to detect whether or not blood vessels would rupture. And in order to do this, he used image processing techniques that looked at differences in red color. And the claim is directed to looking at changes in red color where those changes correlate to the presence of blood. Well, is the claim really directed towards changes? I mean, I thought the claim was kind of an open – you know, a straightforward comparison, right? I think that's right. So comparing a test sample to two reference samples, seeing if it's more like one or the other, and at a certain decision point displaying the presence of – that's when the display would show that there's an indication of blood. So it's a pretty broad claim in that it's just talking about detecting a change in red color and then deciding that correlates to the presence of blood and then displaying a position monitor. So the comparison is a different comparison between the claim in Hirata, or is it the government's view that it's the same comparison? I'm not following. Our view is that what Hirata does is it does also compare a test sample to two reference samples. It's looking for a different kind of pathology, but the board found that it would have been obvious because Hirata is talking about red color to make that leap from what the pathology Hirata was looking to to the presence of blood. That's because – only because blood is red, right? I mean, you have Hirata that's looking for the potential for a rupture, and it does it on the basis of color. The invention apparently actually detects the presence of blood. That's correct. I would say, though, that the way the claim is written, it talks about change in red color correlating to the presence of blood. Applicants seem to suggest that this means active bleeding, but I think the claim is written a little bit more broadly in that it's looking for a change in red color above a background healthy tissue. So it could be active bleeding, and their specification also talks about blood clots or diseased blood vessels. So they're talking about a change that's different than the background color, and I think their claim is broad enough to encompass any of that. But putting that aside, Hirata is talking about the likelihood of future bleeding, and that's what they were looking at with their different ways of looking at red color. Is there a difference between the likelihood of future bleeding and the detection of actual bleeding, which isn't that what Claim 57 gets to? Oh, I think if you assume that that's what Claim 57 is getting to, I think that's where the board found it would have been obvious, because Hirata is showing that the level of VR was relatively sophisticated in making different comparisons between tissues in the gastrointestinal tract. That they were doing something that's arguably even more complicated, trying to figure out when something's going to bleed in the future, and they're able to do this in two different ways, finding two different analyses. And so based on that, just finding blood actually, in a sense, is even easier using red color analysis. It's my understanding that what Hirata's doing is looking for bloody tissue. What Hirata's doing? I'm sorry. I think that's one way of looking at it, that one of their methods of analysis, the color sign, was looking for bloody spots, essentially. The difficulty in these kinds of analyses are that there's a leap made by the board, and we evaluated, I guess your view is based for substantial evidence. There's a gap between the two, and then it's just a conclusion as to whether one skilled in the art would have known to make that leap, right? I think that's right. I think if you look at the two references here, especially starting with Marone, which is the swallowable castle, which discloses a video camera, discloses a means for detecting blood, and that was already in the prior art. And then Hirata, which is actually a much earlier reference, is already showing a bunch of different ways to compare tissue samples. And the board is essentially saying it would have been obvious to automate these ways that are known in the art to compare red color to arrive at what they're trying to claim here, especially without any more specific limitations in their claim to a particular algorithm to detect blood. I think the broadest reasonable interpretation wouldn't even necessarily require it to be done automatically. Certainly their embodiments are automatic, but I think the way the claim is written, you could gather all the images from the swallowable castle at one time, and then later do data analysis at another time with the data processes. It doesn't claim 57. Isn't it different in that it compares the values of – It actually does more than Hirata does, it seems to me, because Adler, apparently to me, gets the values of received images, compares them to a reference value of blood and also a reference value of healthy tissue. So you have something going on there that's quite different than what's going on in Hirata. Hirata is taking received images and it's comparing them to a spectrum. It doesn't compare it to the healthy tissue, not at the same time anyway, to a healthy tissue, or even to a reference value of blood. I mean that's why claim 57 can detect blood and Hirata can't. So what is it that a placenta would look at Hirata and say, oh gee, this is what I need to do now in order to get to claim 57? Well, I think the teachings of Hirata actually, because Hirata teaches how to predict, there's actually more going on than just a single comparison. So what Hirata is doing, for example, with the red color sign, is that it's taking the red color signs of a bunch of patients and it's finding that the higher your red color sign is, the more likely your blood vessel is going to hemorrhage, the lower the reverse. There's no assurance under Hirata that there is a hemorrhage. That's correct, it's a prediction. It's a prediction. Right. And claim 57 gives you a real-time picture of a bleeding tissue. What is it in Hirata, or even in Moreau, that would motivate a placenta to combine the both and arrive at claim 57? Well, first of all, I think Moreau does already teach detecting the presence of blood, so that particular limitation is met. And what Hirata is doing is... Moreau says a means of detecting, but there's no structure there. It doesn't tell you how it's going to do that. And that's exactly why you have Hirata. But I think it's also fair to assume that in Moreau, that because the use of the video camera... If that's the case, and you combine Moreau and Hirata, you're just going to end up with a swallowable pill that predicts the potential for a rupture. Well, I think what the board was holding there was that, based on Hirata's teaching, that you could at least do that. It would have been obvious to reconfigure that to look for blood. If it's already known that you can make a prediction for a likelihood of hemorrhage, then it would not have been a very far leap to make an actual detection of bleeding that's going on. And that's where I think the board is looking at Hirata and saying it has a lot of different methods of red color analysis. And it's able to do something fairly sophisticated and say that you can detect the likelihood of future bleeding. And because just detecting blood is a known color differential, then you can... I see that because we have the invention, but it just seems to me that you're arguing a little hindsight here. You're looking back and you're saying this would have been obvious because we have the capability of detecting blood now. But there's nothing in Moreau that I see in Hirata that would lead one to build the structure for the detection of blood in real time. I think in many ways, Moreau could have almost gotten you there itself because that is a swallowable capsule that can display location and it can have a means for detecting blood. It's just that the means isn't further explained. So my reading of Moreau is that it can, and I believe the board relied on it for getting this much of the way, is that it can in real time go through your body and let you know where the capsule is and also detect bleeding. So then if you want the particular way that they're claiming, which is the method of tissue analysis, then you're looking, obviously, to Hirata. And that's where the board is relying on the fact that various methods of color analysis are already known. And your suggestion earlier was that, indeed, Hirata comparison seems much more sophisticated. Right, exactly. And it's sort of, you know, I appreciate that it's almost a look back. Like you can safely assume it would have been obvious to do the preliminary step, which is something fairly basic. Hirata takes you several steps beyond that in terms of the sophistication of its comparison. Right. And I believe that's our argument and I believe that's what the board was relying on. There are no further questions. I will yield the remainder of my time. Thank you. I think we're starting to get to the heart of the issues here. One is the point Judge Prost just made about Hirata being more sophisticated. We don't see it that way at all. The clinical teachings of Hirata are simply don't have reference values at all. What it does is you look at a picture. You know where the varix is, right, because you have a patient. He comes in for portal hypertension. You put an endoscope down there. You take a picture of the varix and you compare the red color tone of the varix to the red color tone of the esophagus. Who does the comparing? The doctor. Yeah, I mean you can do it with a program to extract. But he talks about manually identifying, I believe, a triangle that encompasses the varix region. And where does the comparison take place? Does it take place immediately, two weeks later? I suppose it doesn't take much time to have a program that compares. If you identify the varix region, it can give you an average red value of that area to an average red value of the esophagus area. Essentially in real time. It could be in real time indicating the future prediction in real time. But that is just a… No, it analyzes in real time. Now you can use whatever you get to make future predictions because that's something over and above, right? It doesn't in real time detect the presence of blood. What it does is this ratio, RR, it's been referred to in the briefs. The board didn't talk about it at all. But this ratio, RR, the clinical implications are if it's less than one, this is a… Specifically, this is what Hirata says. You compare your RR, which is the red of the varix ratio to the red of the esophagus. If it's less than one, you have a likelihood of future bleeding. That's just one comparison to a threshold. You don't have this detection of blood because you know where it is. You know where the varix is. And you perform this single comparison. Another point I wanted to make is… In Marin, right, which lets you move through the GI tract, right, and you use that simply what you've just described as the Hirata examination, but you do it all the way through. Isn't it going to find anything that's red? If you were to combine Hirata with Marone, what we think you would come up with is a swallowable capsule that, when it came upon a varix, would compare the red color tone of the varix to the red color tone of the surrounding esophagus or the surrounding tissue and give you a prediction of likelihood of future bleeding. You still would not get a detection of blood. This doesn't get you to the detection of whether there is a pathology there at all. That's what Hirata definitely does not disclose. He doesn't disclose detecting whether there is a pathology, which is the point of comparing to two reference values. And a reference value for blood is something that Hirata just doesn't teach because that's not his purpose. And if the board wanted to tell us that it would have been obvious, it could have said that, but it didn't. This is one of our auxiliary grounds, is that there was not enough basis in the decision to follow the board's holding. One point about an alternative basis is the new ground of rejection. I just wanted to throw in a sentence about this. The examiner rejected the claim based on the red color sign, and the board affirmed the decision on a completely different basis, which is the red color tone, which is what we've mostly been talking about today. The examiner didn't reject the claim based on the red color tone analysis, and so at the very least there's a different basis. There's a new ground of rejection that the board raised, then the examiner put forth in the final rejection. We have the argument. We thank both parties. Thank you.